and Mark Oswald v. Tom Schaefer, and paneled by Brian Kohut. Mr. Kohut. Okay, please report. Good afternoon, Your Honors. My name is Brian Kohut. I am an assistant appellate planner with the Office of the State of California. I represent Mr. Tom Schaefer, the defendant in this criminal matter. Following a jury trial in Henry County, Mr. Schaefer was convicted of the production of between 51 and 200 cannabis plants. He was sentenced to 30 months probation. On appeal, he raises four issues. Today, I would like to focus on the second issue. That's the propriety of the police officer's testing of cannabis in the basement of the Kew Lawn Police Department. Dr. O'Yara, a police officer executed a search warrant at 431 Dewey Avenue, Kew Lawn. They found suspected cannabis plants, pulled all the plants out of the soil, and put them into a single bag. Based on information that they found with that resident, they conducted a second warrant, a second search, at 317 East Central, Kew Lawn. There again, they found suspected cannabis plants, pulled them out of the soil, and put them all together in a second bag. The state charged the defendant with possession of more than 200 cannabis plants and possession with intent to deliver 30 to 500 grams of cannabis. The first one was a Class 1 felony, the second one was a possession charge with a Class 3 felony. The state submitted the plants recovered from the Dewey residence to the Forensic Sciences Lab in Morton, but the lab tech, Joan Liddle, would not test each plant for the presence of cannabis because they were all shoved into the same bag. Instead, she would only test a portion of the contents of the bag and provide a gram weight for the substance. Officer Tim Pence tested the cannabis plants from the East Central house, individually in the basement of the Kew Lawn Police Department. Just before trial, the state filed an amended information charging the defendant only with the cannabis plants that they recovered from the East Central residence that Tim Pence tested. The cannabis plants should not have been admissible in this case, where a police officer performed microscopic and chemical testing of the plant in a statutorily unauthorized and unaccredited facility. The chemical tests were unreliable due to contamination. Again, this is the basement of the Kew Lawn Police Department, a police officer conducting these tests. This is not Morton Labs, this is not a Morton scientist. Initially, Officer Pence's basement testing was not authorized, and therefore the evidence was inadmissible. Per statute, this is a quote, the Department of State Police is authorized to establish laboratories for the purpose of testing of controlled substances and cannabis which are seized. Such statutory authority is critical because cannabis and controlled substances are inherently illegal. They are illegal to possess by anybody unless there are specific statutory exceptions. Now, does this stand to say nobody else can do it? Yeah. It does not, Your Honor. It doesn't. But there's no authority for the establishment of any other testing facilities. There's no authority allowing for testing facilities of any law. Well, it goes to the subject matter is an authorization to create testing facilities, which maybe I'm not sure what the statutory purpose was, except the plain language at this point, unless you've got some legislative history that would suggest a plain reading. Well, the purpose is obviously to allow the Department of State Police to test controlled substances and cannabis. Otherwise, it is inherently illegal. I mean, it's illegal to possess the substance, so the statutory... Well, it isn't illegal for the city, the village of Middlegrove, to have a duly authorized officer to take possession of a controlled substance. I think those are specific exceptions to the inherently legal nature of controlled substances and cannabis. Right. But I'm suggesting, perhaps, that since it's only authorizing the police to budgetarily provide for a facility to test, does not exclude an authorized officer to test, does it? Is that your argument? It's only authorizing the Illinois State Police to establish forensic sciences lab departments to test cannabis and controlled substances. It only is. They're the only ones. That's Mr. Schaffer's position here. Yeah, that's his position, but where is it in the language of the statute? Again, it just feels... It's not there. It states to the Department of State Police it's authorized to. If the General Assembly, the legislature, wanted to authorize other law enforcement offices, other police departments, to test cannabis and controlled substances, by having them in the basement of other police departments... This Keewan officer at the police station was doing a procedure that he was taught by whom? By the Illinois State Police. Okay. It was during an Illinois State Police class that was administered... So why are they training officers to do it? If you're saying they can only be determined in one of these labs. It's for the education of the officer. Your Honor, our position is that even if more scientists, Jody Little was not authorized to test this cannabis in the basement of a Keewan police department. Now, again, if the General Assembly intended that law enforcement officers, individual police departments, could test controlled substances and cannabis, it would not have limited it to the Department of State Police. It would have stated all law enforcement officers can test cannabis and controlled substances. Is that in the cannabis statute or is that in the statute for the Illinois State Police enumerating their powers and things? That's in the statute for the Illinois State Police. So the statute for the Illinois State Police says that they're authorized to set up labs for testing? Yes. Okay. But there's nothing in the cannabis statute that says it can only be tested in a State Police lab. That's accurate, Your Honor. Okay. Again, the Cannabis Production Act, or the Cannabis Act, it doesn't say anything about it in any law enforcement agency testing. But the Department of State Police Act, it authorizes State Police to conduct testing of controlled substances and cannabis. I'm not aware of any other act that speaks to the testing of controlled substances and cannabis for any law enforcement agency other than the State Police. Let me try another tack here. Okay, so you've got a bag of cannabis as it's sold, not the plant, but as it's sold on the street. And let's suppose that somebody puts a pound of oregano in there and five grams of cannabis, mixes it all up, goes to the State Police crime lab, they take a sample out of there and test it, and they find cannabis. You've been charged with a full pound, right? Yes. Yes, absolutely. So the fact that the State Police didn't check everything in the bag, so what? But it's the State that commingled the substances in the first place. It's just like the other cases where you have 11 different envelopes of cannabis, you take all those envelopes, you throw them in the same bag, and you give them to forensic scientists, it's the officer who commingled the cannabis. It's not what you find on the street, one pound of cannabis mixed with the oregano that you sent to the lab. That's already found in one package. You have the police officers who are commingling the substances here. There's a Supreme Court precedent on the reset Clinton case in Coleman, in our briefs. You simply can't take the entire weight, you can't commingle all that substance, and then charge the defendant with the entire weight. Unless you show us something. You can if you test each bag individually. If you have 11 different bags, you don't put them together, you test 11 different bags, you can charge him with whatever the total weight of those 11 different bags. But once you take all those bags, and you put them in together, and you send it off to the police lab, turn it to Morton, to Illinois State Police Lab, you can't charge him with the entire amount. So it's your position that because these were growing plants, that they've got to test, they're all growing together, they've got to test each plant individually. Yes, yes, that's how it goes. They have to determine because there's less included offenses here. There's 520, 521, I think it's 50 cannabis plants. You have to prove the number of cannabis plants that you're asking for. If you take 200 cannabis plants, throw them all in the same bag. If you take, let's say for example, your original example. If one cannabis plant, 99 original plants, you throw them all in the same bag, and then you take them out, you dry them out, throw them back in the same bag, and you test them, that one cannabis plant, it is dried out. It'll flake apart. That's what plants do. And so when you microscopically test, when you chemically test those, you have particles of that cannabis plant all throughout that bag. You chemically test those, those tests, chemical tests are contained. Every test that you're going to do on every original plant is probably going to test a positive cannabis plant. So in that event, because it's co-mingled, just like the 11 separate bags, he should only be charged with one cannabis plant. Or appropriately convicted. Here, he admits in the video that he did have five cannabis plants. We can't go ahead and lower the bar. Well wait a minute, but he said five cannabis plants, but he said the others were what, clones? He said they were clones. What's a clone? From the testimony I don't, I think it was Officer Wade who testified that a clone is a clipping. You clip off a piece of the plant, you throw it in the soil. But that's not a plant. And what do you get? That's just a stem. Of course it is. What is a clone? It's a reproduction of that which is being cloned. Once it becomes established, I mean before it's a plant, it's just a cutting. It's a cutting that you cut off a plant and then you throw it in the dirt. Before it starts to grow, it's still just a stem. Well here's the thing, if you test that as nothing, you're going to come up with cannabis, right? Sure, but it's not a plant. It's just a stem. Now this we actually have, I'm imagining you're a hothouse, okay, you know, this time of year and actually a month earlier, people starting tomato plants. Sure. Okay. So are these in little containers with a plant growing out of each little container? If I recall correctly, I think they're in kind of flats. In a flat. Okay, flats. I think they're in individual cells of that flat. Right. You know, I don't recall. Yeah, okay. They called it a tote. Well, I think the tote was separate. I think the tote was separate cannabis. It was cannabis that was already processed. It was not live plants. Okay. There was a separate room that the police found. And there they said they found a plant stuck into individual cells. Okay, so your definition of a plant would be a plant that's growing with a root system and you pull it out of the soil, right? That would be a plant. Yes. And a cutting, obviously, is cutting off the plant, sticking it in the soil. Yes. Yes, exactly. And you can do the same thing with tomatoes. So you wouldn't call that a plant? Not until it starts to grow on its own. Because you can pull it out.  When is a plant a plant? So are you telling me that they picked out a plant with roots and then other little containers that had just a leaf in it? That's possible. Okay, that's possible. Yes. But, I mean, you cannot prove beyond a reasonable doubt that every single one of those plants in that bag was cannabis. Because you could have just one cannabis plant, it would co-mingle with the rest of them, and it would contaminate the result. But he said they were clones, right? That's correct. And he had taken cuttings off a cannabis plant. And when I take a cannabis plant and cut something off of it and hold it in my hand, what have I got? Cannabis, right? I think that's accurate. So it doesn't become not cannabis because I cut it off of the plant. Now, if I take it and stick it in the dirt, water it, fertilize it real well, or maybe not so well, I still got it. What do you call it when you put it in the dirt? What do you say? I'm going to do what for this? Plant it. Plant it. And so now you've got a plant. Now, if it doesn't grow, then you've got a dead plant. But you still got a plant, right? Well, I wouldn't call it a plant unless it's able to... Well, the plant is a verb. You're trying to... But to be illegal, it has to be a noun, doesn't it? Sure. Okay. So it's back to the question. When does it become a plant? When you're sticking it in the soil, you're planting it. It's not a plant until it grows roots. Thank you. You followed my argument, didn't you? Yes. My understanding is that when they got the plants from the Central Street house, that those were not dried. There's something in the record that says that they hung them up to dry. That's correct. So at the time that they got them and they were not separated, they were still together, they were not dried plants. They were green plants. That's correct. So they wouldn't co-mangle. They put them all in the same bag, brought them back to the blue department, hung them up to dry, put them back together in the same bag, threw them back in a bag, and then... Why'd they do that? Why didn't they send it to Morton, Your Honor? I mean, Morton doesn't charge for their services. The reason why they didn't send it to Morton is because they wanted to charge them by the plant, as opposed to getting the gram away with the substance. They wanted the higher charge, is what they wanted. So instead of sending it off to Morton, like they did with the plants from the Dewey residence, that they sent off to Morton. But they didn't present that to them. They didn't bring those plants. Because she wouldn't test them. Because she wouldn't test them the way that they wanted them tested. So they had the police officer in the basement of the Keewaunee Police Department pull apart all those co-mangled plants and test them. Test those plants. And that's the only evidence... And they counted the number of plants, right? Well, you just called them plants. That's what he called them in his testimony. And that's what the record... That's what his statement in the record was. And he pulled them apart, and he said he tested each individual plant. And you look at it, there's... It became Lana and Levine tests. You look at them microscopically, and then you perform a chemical analysis on these plants, on this material. And so when you're performing that chemical analysis, if you have, say, as I argued earlier, if you have one cannabis plant, 99 oregano plants, the cannabis plant has dried up, it's shoved it back in the bag, it's going to break up. It's going to break up, and little bits of cannabis are going to fall... Every oregano plant is going to probably test positive. Who would be hanging an oregano... drying out an oregano plant? Well, it's the police officers who dry out plants. They're the ones who collected it and pulled it out of the soil and threw it all in the same bag. Had the police officers individually packaged each one of those plants, we wouldn't have this argument. We wouldn't have this portion of this argument. Is there testimony by the officer that he or she tested each plant? He did. After he took them out of the bag where they were dry, and then commingled, all shoved in that bag, he said he tested each thing, he pulled each part of it out of the bag, whatever you want to call it. He pulled a plant out. Yeah, he pulled a plant out. An individual plant, probably. Again, the chemical analysis would be contaminated if only one of those plants was chemicals. You cannot have accurate results, reliable results, by testing chemicals on plants. And that's part of the assertion here, is this is done in the basement of the police department. Our argument is that he's not authorized to do it. Can I give you a hypothetical here? That's fine. Yeah. A hypothetical. Okay. A person plants... Sure, show it. Tulips. Tulips. Okay. And decides in the middle of that tulip bed to put a marijuana plant. And someone sees it and says, that's a funny leaf. And the police show up, and they pick up the tulips, pull up the tulip plants, and they pull up the marijuana plant. Are you telling me the marijuana plant will somehow contaminate the tulip plant? Yes. It will? For chemical testing. It will. For chemical analysis, yes. Because you gather up the tulips, gather up the cannabis, hang them up to dry, and once they dry, of course, plants, when they dry, they split apart. So these were plants that were already drying next to one another that were taken to the lab. Not the lab, but to the police station. No. The police officers pulled them all out, shoved them all in a bag, took them to the police department. Then they, the police officers, hung them upside down to dry. They actually... They hung them upside down to dry. Because they could... Because they were worried that they would become moldy. Throw them all in a bag and sit the bag shut or put a paper bag in there. It would be moldy. So they're drying marijuana plants in the basement of the police station. Basement of the Kenilonia Police Department. Along with the tulips. And then once they dry, then they gather them all together again. Can they be tested while they're just... They've been pulled up from the... Yes. Yes. And that's what Joan Little said. That's how the Illinois State Police would test these plants. She was not allowed to testify. She was... She would have testified that the Illinois State Police, they required that the police departments bag up each individual plant.  Take one out, put it in a bag. Take one out, put it in a bag. Then they would test by the plant. But would they be drying the plants? They had to dry some of them or else they would rot. Unless they sent them right away to the morgue. So back to my original question. A green plant that's been pulled out of this little container cannot be tested as to whether it's marijuana? Yes. Yeah, and that's my original answer. You take one plant out, you can test that as tannin. You don't have to dry it. You don't have to hang it upside down dry. Nope, not at all. They dried it because they weren't going to test it right away. He didn't. Pence didn't test this for nearly a month and a half after it was collected. What? It was collected... Can you do that test on a green plant? Yeah. Is cannabis only in the leaves? Can they test the stem or the trunk of the plant? I would imagine so. I don't have that information in the record. What they're looking for is cannabinoids. So if there's cannabinoids in the stems, then the chemical analysis... You know, actually, I stand corrected. Let me take that back. No, you cannot test cannabis by the stem because you have to do a microscopic analysis of the leaves. Microscopic analysis of the leaves, yes. They call them systolithic hairs on one side of the leaf, and then there's another kind of hair on the other side of the leaf. You have to have those along with the chemical analysis to show that it's cannabis. So no, you couldn't test the stem. Well, here's the thing. Can you prove a fact by circumstantial evidence? Yes. Do it all the time? Yes. Okay, so... The coppers come in there and they say, he's got all these plants growing. We tested some, but not all. But they all look the same. I mean, isn't that circumstantial evidence that this guy wasn't growing oregano or something else? And isn't your argument that, well, it could have been something else? Isn't that an argument for a jury? There's not circumstantial evidence to prove the fact that they were all cannabis. Well, under PARC. PARC requires testing of cannabis plants. If you don't test the plant, then you can't prove it's cannabis. It requires microscopic and this chemical analysis. You have to have both to prove the unreasonable doubt that that's cannabis. The position here is that you have to do that with each of those plants. Okay, so back to my green plants. We know that stems you can't microscopically analyze. Correct. But you can leaves. Yes. At what stage is a growth? I'm sorry? At what stage is a growth? For a leaf? Of the plant, of the plant. Again, it goes back to my original, I think it has to have roots. In order to be a plant, it has to have roots. Okay. Yeah, but that's to establish whether it's a plant. But now the question is, to identify the nature of the plant, you're saying you have to have a leaf. Yes. Okay. And you can't, and now you're telling me that even though it's a green plant that's growing and you uproot it, if there's a leaf, it can be tested. Correct, yes. It doesn't have to be dried. No. Okay. And I see my time is up for us. It's fascinating, actually. Mr. Oshkel. May it please the Court, counsel? The counsel just argued Issue 2, and I will also continue my remarks to that issue and the challenges. The admissibility of the cannabis plants where the officer who was state police trained and certified to test the cannabis did not test the plants in a nationally certified lab. The defendant admitted in his main brief... Can I ask you a question about the certification to test? Yes. What does that mean? Who issues it and what does it mean? The general state police lab administers the training. It's 80 hours over a two-week period. We describe the procedure. I believe it's on page 26, footnote 7 of our brief that comes off the state police website itself. Right. The defendant is... Is that so they can just drive down to Morton and spend a weekend testing plants? Well, Morton's a nationally accredited lab, but I suppose if Morton allowed them to come into the lab... Well, I'm trying to see if the argument that the opposing counsel says that testing the plants can only be done in this authorized lab. That's not the law. I know that counsel is trying to push that, but the administrative code that he references is specific to the Department of State Police and authorizes labs for the state police, but it does not require those labs to be nationally accredited. The Illinois State Police website specifically states that the crime laboratory accreditation program is a voluntary program, so it's not even a requirement to do that. People have acknowledged in our brief and we use them now that the Kewaunee Police Department does not even have a crime lab. They only have a secondary set aside for testing the cannabis. Of course, the defendant is arguing that the authority for the ISP to establish forensic labs in this legislature silence about allowing other agencies to establish those facilities should be seen as an intent to confine forensic labs to the Illinois State Police. People are in support. Should I reject the defendant's conclusion where Ms. Little of the Morton lab testified in her offer of proof that many police departments do their own cannabis testing. Otherwise, the ISP labs would be overrun and the ISP sponsors training in the area of cannabis identification. On their website, they currently provide local training services as they list them, and under that is marijuana leaf detection, which, of course, I just mentioned is in our footnote 7. And such trainings operate under the Administrative Code 20 IFCS 2605-260540, which states the Division of Forensic Services shall exercise the following functions. Under paragraph 3, provide assistance to local law enforcement agencies through training, management, and consulting services. So if they train them, they obviously can train them in the cannabis detection. Do they have to follow the same rules as the labs, the established labs? No, I don't believe so, Your Honor, because a nationally accredited lab is the golden standard. And so the standard that they would use would be higher than one might use on a local level. And that's a process of making sure without a shadow of a doubt that whatever the testing was done was accurate. Isn't that what we want? Well, absolutely, but what we have here, this testing was still accurate. It just wasn't done where the crime lab requires an individual plant to come in before they will test it. That is not a requirement. This court, for instance, in Little, there were 11-11 envelopes of plant material that were all co-mingled. And this court found that the analysis of the mixed-up plant material established all of it was cannabis. So there is precedent in this own court itself that mixing up the cannabis still can be determined that the entire material is cannabis. Is that true under all circumstances? Is there not some requirement that if there is a lesser included that it has to be proven accurately? Everything is to the reasonable doubt standard, of course. But in this case, for instance, the defendant said that because those plants were mixed in the bags, all 109 plants were tainted because they were mixed together. But Officer Pence viewed the leaves individually from each plant and pulled a leaf. He viewed it under the 3D stereoscope to observe systolithic errors. He found those individual leaves and took the leaves from the individual plants, separately ground them up, and using what the Supreme Court has called an easy-to-use, you can model a violent chemical test to prove each plant was a cannabis test. We described his testimony on page 18 of the University of New York brief. And what he did is describe that entire process in detail. He said he took each individual plant after he was done testing it and put it in a separate bag. So at trial, even though it was put back together into big bags, each individual plant was in a bag with the root ball, he said. He wanted to maintain the root ball so that we had clearly individual plants, not just collections of leaves and stems. This would be called locking the barn after the horse is stolen? No, Your Honor, because he still had to test individual leaves. You're not going to get a tainted 3D stereoscope with 60 times magnification to show those bare, false systolithic errors. If he had done all of that, why did he need to put them back in individual bags? That was his choice, Your Honor, to make sure that he maintained the individual plant ball. Because this charge was not about a certain amount, like a gram of cannabis. It was about number of plants. So he was making sure that he had individual plants individually wrapped to show that he tested them individually. Okay. If people are going to stand, I'm ready for any other argument. Unless you have any other questions. No, thank you, Mr. Oskil. Mr. Poole had some rebuttal. Just briefly, Your Honors. As was noted during the state's argument, there would be many, many different police, quote-unquote, laboratories. All of them would have their own policies, their own procedures. None of them would be required to follow Illinois State Police policies. The legislature cannot contend with that. Well, look, the Morton Crime Lab doesn't just test marijuana, the cannabis, right? There's all kinds of drugs, DNA, the whole shooting match. So they're a nationally certified lab. And the scope of identifying cannabis, we're not talking about rocket science. So the fact that they're nationally certified, I think, wouldn't you suspect, has more to do with other things they do at that crime lab as opposed to testing cannabis? Well, sure. I would agree. They're nationally certified in all the different categories of their testing, all their forensic services that they do. And those state police people over there took this policeman, put him through some training, and certified that he was able to test cannabis. They called him a marijuana weed technician, marijuana weed investigator, something along those lines, which he's not. He's not a forensic scientist, Your Honor. He's not a forensic scientist. I mean, there's nothing more I can say about that. But again, if you allowed these individual police departments to test their own cannabis, what would dissuade them from testing their own controlled substances as well? Nothing. I mean, because the state police is the only organization that's authorized to test cannabis controlled substances. If this court finds that... Well, it's not you. That's your reading of this case. Sure. And if this court holds that that's not accurate, that individual law enforcement agencies can test their own cannabis and controlled substances, why wouldn't we have... Well, he's certified as a marijuana leaf detection in marijuana leaf detection. Right? That's accurate. So how do we go off the cliff on other controlled substances? Because it's the same statute. It's the same statute. Our argument is that this only authorizes state police to conduct... It only allows the state police to test for cannabis and controlled substances. The same statute for controlled substances and cannabis. That's what you want us to rule? That that language only authorizes that? Yes. And if this court disagrees with me and says, well, this doesn't bar law enforcement agencies from conducting their own cannabis experimentation, then it would allow them to do controlled substances as well because it's in the same statute. Well, last time I looked, the same statute licensed physicians, chiropractors, and midwives. So does that mean we've got to treat them all the same? I don't think so. I'm not familiar with the statute. They're under the same statute. But again, if this court finds that this is not... If this allows other law enforcement agencies to open up their own other cannabis labs in the basement, we're going to have 1,100 different labs with 1,100 different policies. Maybe some of them will be accredited, some of them will be approved by the Illinois State Police, some of them won't. Well, he's a certified... marijuana leaf. What is his title here? I thought it was MLI. Investigator Marijuana Leaf. Identifier. Okay. And we're not disputing that he's an expert. We're not saying that he can't conduct this test. We're saying that he cannot conduct this test in the basement of the Illinois Police Department. He's simply setting aside their authorization. There's no indication of... He's not accredited. There's no indication of what tools he used, whether he calibrated materials, whether he was subject to any second looks. Was he cross-examined and all that stuff at trial? Or on a motion to suppress or something? Was that all gone through? No, not really. It was really just what he did to this specific cannabis. And did anybody challenge what kind of tools he did? Wasn't that a place for... You're trying to say this guy can't testify because... Well, the question is whether we can reliably... whether we can find it... deem his findings reliable. And when he has no policies, no stated procedures, it's hard to cross-examine what he should have done when he had no policies. Well, that's why lawyers get the big bucks, you know. They go ask those questions. Come on. There seems to be a theoretical problem where you have an authorized lab, an accredited lab, that says we won't test it if it's been mixed because we can't guarantee the authenticity of the result. And then you have other labs that mix stuff all up and say that we can tell about the authenticity of it. It seems like you're getting two different levels of justice here. Exactly. Exactly. You have the Illinois State Police who requires that these be individually bagged, individually packaged, individually sent to... Well, they can be sent together, obviously, but they need to be individually packaged for more than to test them on a cannabis plant. This is an end-around for going to Morton. They had officer testees in the basement of the Illinois Police Department because they wanted the higher charge. It's an end-around at Morton. Otherwise, they would have had to send it to Morton. Morton would have tested one part of the bag and weighed it, and then that would have been it. And did the state police crime lab person, did they testify that because of the way they were packaged any testing would not be reliable? She was not allowed to testify. You're talking about... There was an offer of proof. There was an offer of proof. She said that we were not tested because we've notified other police departments that you have to set... Okay, but we don't know that the reason they don't do it is because it would render the test unreliable.  It's the only inference from the record. They're not getting paid. It sure would have helped if somebody, if the defense were trying to keep this other guy from testifying, would have called her and said, Ms. So-and-so, you wouldn't test at all. And that was because the cross-contamination, any testing would be unreliable. And what would stop you from doing that so they wouldn't have to decide what... And during the offer of proof, this is what she... It's not really what she would testify to. This is what I would like her... like to bring her in to talk about. And what... And please tell me in the offer of proof if what the offer of proof actually said. I mean, what's the language in the offer of proof? It's several pages. I mean, it's not just a written offer of proof. It's an examination. Okay. In that examination, did they say, by combing these plants, would it affect the reliability of testing? Did she say that? Specifically, no. But again, that's the only reasonable inference. That's the reason why she wouldn't test it. I mean, there's no other reason why she would not test it. Why wouldn't she be asked that? I don't know that. This is all... Right, exactly. Right. There's problems. But you're standing on your brief on that. The ineffective assistance counselor. Well, it's part of the same issue. I mean, she never objected to the introduction of the cannabis plants themselves, so that's the only way it can be brought before the court. Right. And it's hard to know whether he was ineffective in his examination or tried the presentation on for proof, is for us to know what that crime lab person would have said. Specifically, she would have contested Pence's, not necessarily his findings, but his procedure. That's what counsel... That's the reason why counsel wanted her to testify, to counter Pence's procedure. I mean, it was never brought up that she would have said, we don't test this because it's clean. She said, we wouldn't test this because they're all bad. They're all in one pack. The only inference that can come out of that is because they're all... She said that she would have weighed it, she would have tested one part of it, and come up with a grand weight. As we were discussing earlier, but she wouldn't test individual plants. It's not because she's lazy. It's because... She's a state employee. It's not because she's ill. It's a reasonable inference. It's the only reasonable inference that that's the reason why she wouldn't test those plants. That's the reason why Morton wouldn't test those plants. It's because they're... So they... Okay. Thank you. All right. Thank you, Mr. McCoy. Mr. Oswald, thank you, too. And we'll take this matter under advisement. Written disposition will be issued and will be in brief...